Welcome to the first day of our panel sitting here in Atlanta. Judge Rosenbaum and I are very, very thankful and very, very happy to have with us Judge John Steele from the Middle District Court in the Fort Myers area for a fairly long time, but he's now on senior status and is able to help us a little more with our cases, so we're very grateful to have him here with us. And we'll have Judge Schlesinger here with us on Wednesday and Friday because Judge Rosenbaum and I need all the help we can get. With that, we're that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, then don't worry about it. Just keep going. You're on our time and not yours. And with that, we'll start with our first case, which is number 19-10156, United States v. Ledell Ellis. Mr. Dodson. Good morning. My name is Jonathan Dodson. I'm representing Ledell Ellis and may it please the Court, I intend to begin today with the overbreadth of the mens rea to Georgia aggravated assault, then address the uncertainty of the Shepard documents, and finally, the overbreadth of Georgia-partied aggravated assault. As to the mens rea issue, I believe the merits of this issue are the easiest part. This Court now recognizes that Georgia aggravated assault is a recklessness offense, and two-thirds of state jurisdictions require something more than extreme indifference recklessness, according to the Ninth Circuit's survey. As well, the Fourth, Sixth, and Eighth Circuit have held that generic aggravated assault does not encompass recklessness offenses. So Georgia's offense is a pretty clear outlier. The obstacles I have, of course, are the law of the case doctrine and the prior panel precedent rule. As to the law of the case doctrine, I believe my reading of those cases is that an intervening decision is an exception to the law of the case, and it doesn't have to directly overturn the prior decision in this case or abrogate it. It just has to require a different result. And I believe that United States v. Moss, as well as the Jackson case decided last month, do require a different result, because after you apply those cases, it's not a particularly close question. Again, Moss is the one that said Georgia aggravated assault is a recklessness offense. Jackson applied a more discerning approach to construing a prior precedent under the categorical approach, and briefly, the facts were that that involved Florida trafficking and the definition of cocaine. There were some cases finding that Florida trafficking was a serious drug offense, but the only issue raised was the mens rea, and this Court said that those cases didn't make law on the definition of cocaine, that that was an overlooked issue. It was an unraised issue, not an overlooked argument. And so it felt free to reach that argument, and it ultimately held in the defendant's favor. Except it seems like that was slightly different, right? I mean, the cases that Jackson relied on were all around at the time that this case made its way before us the first time. And so the law of the case doctrine, it seems like that applies here, whereas it didn't in Jackson. Right. I understand what you're saying. I think my point is that because all of the, including the prior decision in this case, construed Morales-Alonzo over broadly to decide a separate issue that really wasn't raised, that Jackson now clarifies that this Court doesn't have to look at a prior precedent that way. And that's the way in which it, applying that intervening decision, frees this Court to reach the issue. That and the only thing left to do is compare the Georgia offense to the consensus generic offense, and that is a fairly obvious answer. That's not a close question. And so I think the methodology in Jackson now is what has changed that allows this Court to reach the issue and get around the mandate rule. And I touched on it just now, but the fact is, I think that Morales-Alonzo didn't involve the mens rea to Georgia aggravated assault. It was about the deadly weapon aggravator. And in fact, in defining generic aggravated assault, it borrowed that from Palomino-Garcia, which explicitly left that issue open, the mens rea of generic aggravated assault. So this Court hasn't decided that issue, and it can reach it. Morales-Alonzo shouldn't keep this Court from reaching that issue. Finally, the government suggested that I forfeited that issue on remand. I would point out that in Borzacus, this Court held Judge William Pryor writing that by objecting to a predicate, a defendant preserves any argument in support of that predicate not being a generic offense. In that case, he was allowed to argue for the first time on appeal that Washington aiding and abetting was overbroad, and it was under a de novo review. The next issue is the uncertainty of the Shepard documents. The Supreme Court has set a very high bar, of course. It requires legal certainty. It doesn't allow factual inferences, and there's no margin of error. And the reason that these documents don't provide that certainty— What do you think? So I'm going to sort of turn the tables on you a bit. What do you think the documents show, if anything? They have to show something, right? So what is that set out? The documents show that it could have been either the generic deadly weapon aggravator or the non-generic intent-to-rob aggravator. The factual basis is pretty clear that both of those circumstances applied. And then the indictment doesn't clarify that, although it does say the phrase deadly weapon, because if you look at the language of the indictment, it identifies the offense as, quote, the offense of aggravated assault, unquote. And then it describes the conduct. It describes how that offense was committed, for that the defendants on this particular date did assault this victim with a handgun. So the indictment is ambiguous as to whether that's an element or a gratuitous fact that it's alleging. And because of that ambiguity, that indictment could be subject—we could just be making a factual inference and not— What do you make of the other counts in the charging document and whether and how they shed any light on what Mr. Ellis was ultimately convicted of? I don't think that they do in this case because it's not that uncommon for a state to charge a defendant multiplicitously. In fact, there were four aggravated assaults charged based on one firearm in one incident in this case. And so I don't think they, in this case, provide that legal certainty, even though the other counts were dropped, and one of which may have suggested that that was an intent to rob. That doesn't necessarily—and it has to necessarily be the generic offense—it doesn't necessarily— Except—I'm sorry to interrupt, but, I mean, it's clear that the statute is divisible, right? Correct. Okay. And so if it's charged in two different counts, as it is here, then it's technically two different crimes that are being charged, isn't it? I think because it could be charged multiplicitously—of course, double jeopardy only requires that there can't be multiple sentences—I think that doesn't resolve the ambiguity because the indictments can and sometimes are redundant that— Except that we've just established that it's two different crimes, right? That there's two different offenses, divisible offenses in the statute, but I wouldn't concede that that necessarily charged two different crimes. How can it not be two—how can it not have charged two different crimes? Because I think it's possible that this was a multiplicitous indictment, that it charged a crime twice, and that, you know, that is—that happens, and double jeopardy allows it, but— I'm sorry. Aren't there different elements for each version of the crime when it's divisible? I mean, isn't that the point of what we mean when we say something is divisible? Yes. Okay, so if there are different elements, and just hypothetically, assume that all of the elements for each of the two different crimes are satisfied, then how is that multiplicitous? Because it could still charge just one of those aggravators twice. I think that the defendants say, this is an element, not a fact. None of these charges cite to the subsection. None of them identify the offense of, quote, aggravated assault with a deadly weapon, and that was what happened in Gandhi, but this positive factor was a statement that the defendant adopted that he committed battery-causing bodily harm, not just the offense of battery. It said the offense of battery-causing bodily harm, and so because this is open to being a factual rather than an elemental allegation, that doesn't provide the certainty that this court needs to determine that it was a generic offense. Finally, the party to a crime issue. I believe that the Coates panel made a lot of headway on that issue. For one thing, it made clear that this court can apply this on an offense-by-offense basis just because I'm saying Georgia aggravated—a party to aggravated assault is overbroad doesn't mean party to a burglary is overbroad. And second, that decision at some length went out of its way with Judge Julie Carnes' writing that—to show that the Georgia necessary and probable consequences doctrine is potentially overbroad, broader than what the Supreme Court has recognized as generic in Duenas v. Alvarez. So you think it's different than traditional-slash-generic aiding and abetting? Correct. Correct. Specifically as to the natural—well, I've made some different arguments. I'm focusing on the natural and probable consequences doctrine because that's the one that the Coates opinion clearly left open. I also think that it doesn't also require an affirmative act, and I'm not sure that the Coates resolved that. I'm going to walk back a concession I made. I think that— Do you think party to a crime doesn't require an affirmative act? In the Shockley case, they found two people guilty without any evidence of any affirmative act. There were just two people in a car. One person was shot, and the court said, we don't know who did what, but they're both guilty. So you think it's a conspiracy-type offense? I think sometimes it overlaps with that, and I think maybe that's how the doctrine has gotten broader in Georgia. Okay, tell me about the example you mentioned about the two people in a car and someone getting shot. If someone got shot, someone did something affirmative, right? Well someone definitely shot the person, but the other person in the car, for all we know, was just fled in horror. I mean, for all we know, they had nothing to do to further that, and the evidence there didn't show any particular— So there was no robbery? It was just a random shooting or a targeted shooting with no evidence of anything else beforehand? The evidence that the court relied on was the fact that they both fled at the same time and then fled the jurisdiction. But there was no—I would say that doesn't create an inference of any particular affirmative act. And so that's the way that I think that the affirmative act is overbroad. I think that the mens rea as well is both because sometimes Georgia applies a backwards-looking approach that sort of reads foreseeability out of it. They're looking at whether it was in furtherance of, and because it doesn't require the level of probability that people v. Montes did, which is what the Supreme Court recognized in Duenas-Alvarez to be generic. But can I ask you one other question, if you mind? Is it okay? No, of course. Thanks. How about Georgia's principle that the act must be naturally or necessarily done in execution? Why doesn't that sort of account for the notion that is required by Rosamund? I think that's the language I'm pointing to that says—that makes it sort of a backwards-looking approach because they're looking historically based on what we know happened. Was this naturally or necessarily done? It's a lot easier to say that. It seems a lot more likely when we know what happened. But foreseeability is a perspective doctrine. It should be based on what the defendant knew at the time and whether the defendant knew the chances were so high of this unintended offense occurring that we could impute the kind of knowledge that Rosamond recognized was generic. And so I think that that language is problematic because it all but reads foreseeability out of the equation. All right. Thank you very much, Mr. Dodson. You've saved your time for rebuttal. Mr. Walker. Good morning, Your Honors. May it please the Court, Stuart Walker for the United States. I'll begin first with the Shepard documents and answer any questions the panel might have, but I think it's fairly clear the district court properly concluded that Mr. Ellis pleaded guilty to being a party to a crime of subsection A2, aggravated assault, under Georgia's Ag Assault Statute. First of all, count two alleges one and only one crime against Mr. Ellis, and that's the commission of aggravated assault with a deadly weapon. That's the only crime it alleges, and in no fewer than seven places in the remaining Shepard documents does the record make clear that Mr. Ellis pleaded guilty to count two. That's once in the sentencing form and at least four places in the plea colloquy itself. So unless the court has further questions of me on the Shepard documents, I think the district court... The question is, what does that mean? That he pleaded guilty to party to a crime of A2 aggravated assault. Right, and my question is, what does that mean in the world of crime of violence under the guidelines? What that means, based on what the panel in Ellis 1 decided, is that under Morales-Alonzo, that because the statute is divisible and this court on remand ordered the district court to undertake the modified categorical approach, that's why we're talking about the Shepard documents. Ellis 1 determined that if the Shepard documents show that he pleaded Georgia's aggravated assault is no broader than generic aggravated assault, and therefore the enhancement for crime of violence applied. In other words, it's our contention that the Ellis 1 panel got about 90% of the way of resolving all of the issues in the case, but for not being able to determine, because there were no Shepard documents in the record, which subsection of Georgia's ag assault statute he pleaded guilty to. And so the consequence of finding that he pleaded guilty to being a party to account 2 is that he pleaded guilty to being a party to subsection A2, which Morales-Alonzo holds is no broader than generic aggravated assault. Can I, I'd like to take you off the issue a little bit. Yes, Your Honor. If that's all right. So, section 4B1.2 of the sentencing guidelines defines the term crime of violence in a certain way. And we only get to the aiding and abetting part when we look to the application note. So my question for you is either, is it clear from reading just the definition itself without looking to the application note that aiding and abetting would be included? And if so, how? And if not, how do we get to the application note? Is there a genuine ambiguity there? Your Honor, to answer your last question first, I don't think there's an ambiguity in the application note. But I think, based on what I'm about to say, the application note is kind of to the side in this particular case. So Your Honor asks, how do we get to the aiding and abetting or the accomplice liability issue but for the application note? I think that's because the wrinkle in Georgia law, which is that a party can be convicted of being an accomplice to a crime without being charged as such. And so a party can be charged as a principal. But if the crime is shown and that defendant is shown to be a party to it, then they can face criminal liability as an accomplice. So the accomplice liability component sort of baked into Georgia criminal law. And so I think taking my opposing counsel's argument on its own terms, we get to aiding and abetting because that's sort of a feature of every substantive statute of conviction in Georgia. So I'm not sure that there's any reliance on the application note to 4B12, as Your Honor posited. So I don't know if it's right to say it's a wrinkle of Georgia law, but certainly it's a specific component that I think this Court and, I can't think of it, Berkovitz or Berkowitz or whatever said that where that, that was dealing with the state law of Washington. And they said in that case, Washington had sort of the accomplice liability component baked into every substantive criminal statute of conviction. And Georgia law is similar in that way. And Bortzakis, I'm sorry, Bortzakis. And it held that therefore you had to address the accomplice liability question. And there was, there was no question there. Well, I'm not sure that was a guidelines case, but I think by analogy, that would be the government's position here about how we reach accomplice liability. Thank you. Turning to the question of aggravated assault and whether Georgia aggravated assault is broader than generic aggravated assault, the government has said for two independent reasons this panel can't revisit what the Court in Morales-Alonzo held. One is the prior panel precedent rule. And what we've pointed out is that the appellant in that case raised the recklessness mens rea issue as a basis for concluding that the offense there was not a predicate offense, there was not an enumerated offense, because the recklessness mens rea was broader than generic aggravated assault. The panel in Morales-Alonzo held against the appellant and we think necessarily rejected that argument. And so we think that holding of Morales-Alonzo, which is that subsection A2, aggravated assault, does not sweep more rejecting the mens rea argument. That's the prior panel precedent argument from the government. But there's, I mean, there's nothing in the decision itself that reflects that, is there? That's right, Your Honor. Isn't that a problem? I mean, I certainly think it makes the opinion somewhat opaque in that you actually have to look at the record. I mean, so part of the analysis, we think the prior... Except, I'm sorry, the record is not part of the opinion. So it doesn't govern us. We don't generally get to look at the underlying record to decide what the court held. I take Your Honor's point. I would just point out that it's not that uncommon for courts to go back and say what issues were raised to determine which issues were disposed of. And sometimes you'll find circuit court cases saying, well, the party argued this issue, see the brief, etc. That's our only point. I would love to persuade the panel that we're right about the prior panel precedent rule, but we don't need to do that because we have a narrower argument under law of the case and the mandate rule that this panel is not free to revisit the question of Georgia's aggravated assault and whether it's broader than generic aggravated assault. That's because the LS1 panel, this issue was raised squarely by the appellant, pages 34 to 38 of its principal brief, before the LS1 panel. The government responded in kind to that. While LS1 was pending, the court decided Morales-Alonzo. The panel instructed the parties to give supplemental briefing on the effect of Morales-Alonzo, if any, on the issues presented in the appeal. Mr. Ellis' counsel submitted a supplemental brief arguing that Morales-Alonzo did not resolve the mens rea recklessness question that had been put to the court in LS1. The government responded. And then in the teeth of those arguments and the briefing on that particular issue, which my opposing counsel was trying to raise here, the LS1 panel nevertheless said that argument fails in light of our recent decision in Morales-Alonzo. And after the panel described Morales-Alonzo and what it held, it said that would resolve the issue but for the lack of the Shepard documents in the record. So earlier when I said the panel got about 90 percent to resolving the principle case, it remanded for the principle reason to go back and tender into evidence the Shepard documents because only then could we tell whether Mr. Ellis pleaded guilty to subsection A2, in which case the outcome was controlled by Morales-Alonzo and the LS1 conclusion, or subsection A1, in which case it would not be. And Mr. Ellis would prevail on his enumerated offense argument. Now, the only exception that I read my friend is making to get around the law of the case in the Mandate Rule is the change in controlling law. And for that proposition, he cites this Court's decision in Moss and the Supreme Court's decision in Borden. The problem with that argument, however, is that both of those cases are elements clause cases. This is and always has been an enumerated offense case. And the reason why that matters is Borden and Moss cannot be a change in the controlling law because elements clause cases do not control the analysis that applies in an enumerated offense case. So elements clause cases and enumerated offense cases are doctrinally different animals. So the analytical framework that applies in the elements clause cases is not the analytical framework that applies in an enumerated offense case. And so you cannot just look to Moss and Borden and ask the Court to wholesale import their conclusion about the recklessness of the mens rea into an enumerated offense case. And the reason is the analysis in an enumerated offense case requires defining a generic crime. And to define a generic crime, that's an empirical undertaking. And you have to go out and canvass the criminal codes of all the states. You have to look at the model penal code. You have to look and see what Lefebvre and other criminal treatises are doing to do that. That is not the analysis that Borden requires or that Moss requires when you're talking about the elements clause. So these two analyses are sort of siloed and they don't cross-pollinate. And so the short answer is that there's been no change in controlling law. Yes, there have been decisions that interpret the elements clause in a way that would preclude a predicate offense that has a mens rea of an enumerated offense case. And to underscore that position, in my friend's Rule 28J letter he submitted last week, he cited a number of circuit court cases that were enumerated offense cases, the primary one being the Jimenez case from the Ninth Circuit. That case was decided in 2015. So that case predated not only this appeal, but also the Ellis One appeal. So those cases cannot support an argument that there's been a change in any controlling law since Ellis One resolved the opinion. So law of the case mandate rule I think precludes this panel from going back and undoing what the Ellis One panel did, even if the court is to reject our argument that the prior panel precedent rule prevents this or any other panel from revisiting Morales-Alonzo. Now on the question of accomplice liability, primarily the other side relies on a case called Cash versus the State from the Georgia Supreme Court in 2015. And what this basically boils down to is a disagreement with the way Georgia Supreme Court applies its natural and probable consequences doctrine. There are a couple of problems with the argument that cash does anything that takes Georgia's accomplice liability law broader than generic accomplice liability law. First of all, cash is a natural and probable consequences case. Yes, it uses the language of reasonably foreseeable, but the Supreme Court of Georgia has expressly equated the natural and probable consequences doctrine with the language of reasonable foreseeability. And I would call the panel's attention to Hicks versus the State, 759 Southeastern 2nd, 509. And I'm quoting, a collateral crime is a natural and probable consequence of the original purpose of the plan if that crime is a reasonably foreseeable consequence of the plan. And so, the idea that cash... Is that a conspiracy principle in Georgia? Your Honor, I believe that case did involve a conspiracy allegation, but I think it's been applied in accomplice liability cases more broadly, and I have not seen any cases that would restrict its application to conspiracy per se. But you, I mean, this area, for me, after reading a fair amount of Georgia law, seems to be a bit of a muddled mess, because part of the suggestion, and I'm not blaming you for this, but part of the suggestion is that almost all of these in co-ed crimes in Georgia sort of overlap with each other, and there's no real difference at the end of the day between aiding and abetting, accomplice liability, conspiracy, you know, party to a crime, etc., etc. They're all one and the same, but they can't all be one and the same if there are different statutory provisions for them. So, it's a little bit, it's a little bit baffling. If I might, just a way of trying to clarify, to the extent that I'm able to do that for the Court, I think one place where the Court might have gone somewhat off track was in Coates. So, Coates, for about six pages, discusses Georgia's aggravated assault statute and addresses this mens rea argument. First of all, Coates only addressed burglary as a predicate crime. So, for purposes of this panel, you're writing on a clean slate. Nothing Coates says about Georgia accomplice liability law will restrict this panel. But where the problem comes in is it identified the Rosman v. United States Supreme Court decision as the relevant precedent. That's wrong. That is a case about what it takes to sustain a conviction under federal aiding and abetting for the violation of a 924C offense. The correct precedent to be That's the only time the Supreme Court has ever set for itself the task of defining generic accomplice liability law. And it expressly says that the laws of almost all the states have a natural and probable consequences doctrine that does not take it further than generic First of all, I would be happy to brief the application note issue that Your Honor raised. I do think that there's nothing ambiguous in the guideline that would require this Court to give binding effect to Application Note 1 to 4B12. As to What do you say in response to your friend's argument that we don't have to get to the application note anyway because as a unique feature of Georgia law, the accomplice liability is baked into principal liability? I would say that if that were a unique feature of Georgia law, then that on its own would make aggravated assault overbroad. Although I think his argument is well taken because I think that's what a lot of states do. So I, perhaps we get to that in a different way, but I do think that Application Note 1 is not a binding application note under the Supreme Court's recent clarification of our deference. As to the aggravated, the analytical framework and the mandate rule that my friend mentioned, there's nothing in the intervening decision exception that requires it to be precisely the same analytical framework. What changed is not the law governing the force clause. It's the law governing, well, it didn't change. What happened is this Court recognized that Georgia aggravated assault is a recklessness offense for the first time. And that certainly has implications to both clauses. And the reason I'm saying that that requires a different result again is because all that's left is to note that that's an outlier, that most of these jurisdictions require something more. And so that's not the consensus. And so it requires a different result, even though that was a force clause case. As for the reasonable foreseeability point that was made, I think that, as Judge Jordan pointed out, that these cases are a bit messy. And that even if we can find language and examples where it was generic aiding and abetting, of course, we look at the least culpable conduct. And it just takes one case that's not generic to find that this natural and probable consequences doctrine is overbroad. And I wanted to elaborate on why I think Cash, not only is it sometimes backward looking, but Cash's application is a lower level of foreseeability than what is generic. The Montez case involved a rivalry between two gangs. And the court there went at some length to say, in this context, when there's a fight between two rival gangs, guns almost inevitably are going to make an appearance. And anyone immersed in that culture would know that. So anyone who starts such a fight would be liable as a natural and probable consequence for an aggravated assault that occurs. Cash, the only thing that the Georgia court pointed to was the fact that the defendants had tricked the victim into showing up and made this inference that... But didn't it also talk about the fact that, was it Wright, I guess, Wright showed Cash or told Cash about his, or asked him to bring the sawed-off shotgun the night before? And I mean, wasn't that sort of part of the reasoning as well? It was part of the facts. I don't think it was part of the reasoning. First of all, Cash assumed for purposes of argument that Wright didn't know about that firearm. And when they're actually explaining the application of that doctrine, natural and probable consequences, they're just pointing to the fact that they tricked the victim. And I would argue that that's not such a strong inference. You might want the element of surprise even if all you intend is a fight. You might arguably want that even more. And so it just doesn't rise to the level of likelihood that a generic application would, such as in People v. Montez. Representative Johnson, thank you. Thank you both very much.